The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon. Welcome to the Browning Courthouse here in San Francisco. It's a pleasure to have you here. This is the time set for moving Oxnard Forward v. Lourdes Lopez. If the parties are ready to proceed, you may come forward. Good afternoon, Your Honors, and if it may please the Court, my name is Chad Morgan. I represent Plaintiff and Appellant Moving Oxnard Forward. If I may, I would like to reserve five minutes for rebuttal. To be valid, a limit on the amount an individual can contribute to a political campaign must be carefully drawn to a sufficiently important governmental interest. The tailoring and the sufficiency analysis are two separate questions, where the only interest sufficient enough to justify limits on a campaign contribution is the prevention of quid pro quo corruption or its appearance. Based on the petition for rehearing en banc and our supplemental briefing, I suspect that the bulk of our attention today will be given to the first prong in the sufficiency of the government's interest, but I do intend to address both prongs. Although, as the sufficiency of the government's interest in preventing quid pro quo corruption decreases, the two prongs tend to converge where it's hard to tell one from the other because... Counsel, can I just take a step back? The limits that were imposed here are fully consistent with limits that many localities, even statewide elections have applied across the country. Is that correct? That's not correct. The limits at issue here are among the lowest out of similarly sized cities. And is that how you're supposed to look at it? It's per capita calculation? Is that what the Supreme Court said we're supposed to do? It's not. But in terms of how these limits relate to what is common throughout other jurisdictions, they're substantially lower. And the city says otherwise. But their report, when they analyzed the limits across similarly sized cities, excluded from its analysis the cities that had no limit whatsoever. And that significantly skewed the results of their analysis, such that it looked like they were somewhere around the median when, in fact, they were far from it. And as a side note, the state legislature has now implemented statewide limits, which would apply to those cities that had not otherwise enacted. But what authority says you're comparing it to limits that are zero, that don't have any limits? That looks ahead to the second prong analysis and the danger signs, where one of the danger signs that Randall identified was that the limits were among the lowest of comparable jurisdictions. And had any of those others been challenged? I mean, what is the lowest limit that's been challenged successfully? I would say it would be the $500 limit in Thompson v. Hebden. So if we – you agree this is a contribution as opposed to an expenditure? Are we in agreement there? We are not. I think when we look at the first prong of the analysis and the government's interest, the city's interest in the limits it enacted is so low that it looks – I mean, it's more of an expenditure limit masquerading as a contribution limit. Well, so if to – for your client to prevail, accepting that Measure B has some impact on Mr. Starr, why does the impact amount to invidious discrimination? And how does the measure harm a suspect group, a minority party, or an independent – independent candidacies? Do you have a case where a contribution limit was voided as being invidiously discriminating? I do not have a case on that point, Judge Callahan. But the invidious discrimination is there in the way that the city tailored this message or tailored this limit in response to Mr. Starr's political activities. Didn't it go to the people and then 82 percent of the people voted for it? And so do you have to show that those 82 percent were invidiously discriminating too? There's no evidence in the record that the 82 percent of the people who voted for the measure voted for it because of the contribution limit. Measure B was a wide-encompassing measure that enacted term limits. It enacted regulations on gift bans. Any one of those reasons— So why does that matter? It matters because we can't look to that and say specifically that the voters wanted to enact contribution limits. Maybe they wanted to enact term limits, and they enacted contribution limits irrespective of that. But I don't understand how that matters in our legal analysis. I mean, at the end of the day, they sent it to the voters. Aren't you asking us to find that the voters were discriminatory in their intent? You have to find that. You don't have to find that. And looking more broadly, it's not relevant. In Shrink, Missouri, the city's defense of the contribution limits, they point to some of the considerations that Shrink, Missouri made, and Shrink, Missouri considered the fact that the voters approved it. But it was an aside where language was used to the effect of not that it matters, but also the voters did happen to approve that. It so happens that the government interest in Shrink, Missouri arose out of— there was a bank that contributed, I think, $20,000 to a statewide campaign and then got the state's banking business. There was a $420-some-thousand contributions. There were allegations of specific instances of trading votes in the legislature for money that are not existent here. Looking back to the support for the measure, we have— But I don't read the Supreme Court to be saying you have to come up with some example of prior corruption in order to put a contribution limit on it. I mean, I assume if that were the requirement, half the contribution limits out there wouldn't— I mean, the idea of a contribution limit is to get ahead of that. And here there was—I mean, I give you that it wasn't exactly analogous, but there was at least some concern about, shall we say, government accountability. I think it's hard to say that there was some concern, but, yes, there was the district attorney's report that looked primarily at staff, primarily at gifts. But it is correct. The Supreme Court has not said here is the line. In Shrink, Missouri, it was the evidence here is substantial. It's not mere conjecture. In Buckley, there's a footnote in Buckley that refers to the district court of opinion— the district court opinion—or the circuit court opinion, I'm sorry, that outlined a substantial amount of concerns about corruption, all arising out of the Watergate scandals at a really tumultuous time. And that evidence, those concerns were not illusory. But relating to this Court's Lehr and Edelman tests— Well, what do we do with Lehr and Edelman? Are they okay? I see two ways of looking at this. The first is neither Lehr nor Edelman really considered this issue because the plaintiffs in those cases essentially conceded the issue, and the focus was on the tailoring. To that extent, I think Lehr is dicta. That said, this Court's dicta is binding on future panels. And to the extent that is true, then I think Lehr and Edelman need to be overruled as inconsistent with Supreme Court precedent, which has never said the minimum threshold is not illusory or not mere conjecture. It just happens in those cases that the quantum of evidence presented was above that threshold. That's not the minimum threshold. I think the test needs to be something based on the totality of the circumstances. Did you raise that argument before your supplemental brief? I mean, I know that that is the argument that is advanced in your supplemental brief, but did you advance it at some earlier stage in this case? I think we may have mentioned that neither Lehr nor Edelman specifically addressed the issue. I don't know that we expressly said that they need to be overruled. I don't know that a conclusion in my client's favor depends on overruling Lehr and Edelman. But as the case develops, yeah, I think Lehr and Edelman are inconsistent with that rule. They're inconsistent with sister circuits except for the first. And, yeah, getting back to the totality of the circumstances, we have the only real pieces of evidence that the city refers to to support the limits is an outdated district attorney's report that took ten years prior to the— But I guess that's my question is do you even need that? I mean, because I agree. I sort of agree with that argument that if you need to show that you're responding to some corruption, the evidence here isn't exactly strong. So where does the evidence that you—where does the requirement come in that you have to actually be responding to— you have to allow corruption or some threshold of corruption to creep up before you can put in a contribution limit? I do think it will be hard to identify a bright-line rule, but— Well, I just want to know where the case is that says that or suggests it. I would say that it's Shrink, Missouri. It's McCutcheon. It's Buckley. It's—Randall's actually kind of silent on the first problem. Those were enacted in response to—the term limits there or the contribution limits there were enacted in response to perceptions. Correct, and I think Buckley and Shrink, Missouri both kind of tell us this is some quantum of evidence that is enough. McCutcheon tells us some quantum of evidence that is not enough. And that's not perfectly analogous because it was the aggregate limit, but an important part of the McCutcheon reasoning was once a donor hits that aggregate, how is it potentially corrupting influence by giving just one additional dollar to some other candidate? And that becomes analogous here because the $500 limit is so low. It's almost kind of insulting to most of the hardworking, honest politicians who are out there trying to do— They're going to take a lot more money. I think the vast majority are trying to do good work. There are some outliers that is inherent in the process, and that will always be true no matter what the limits are. Can you walk through the evidence that this was discriminatory and it was targeting him? I mean, there's certainly some good inferences from it. I think there were some PowerPoints that suggested at least that the city manager was looking at that. Can you walk through that and tie it a little more clearly so that we have an understanding of what that evidence is and how it related to the initiative? Absolutely. The PowerPoint that was attached to the panel opinion was part of the city manager's presentation when they go out and inform the community about the initiative. We look at the statement of purpose in the measure itself, which had kind of a laundry list of three or four different things, several of which the Supreme Court has already said are not valid reasons to enact the contribution limit. And that's in the measure itself. There was similar language in the resolution to put the measure on the ballot. What was that? Can you remind me what the specific? I'm interested more in what was in the resolution. I mean, the problem with the PowerPoint is it's not entirely clear what that reflected and did that actually reflect any of the city council members' impressions or not. But what was the language in what they voted on? It's in the opening brief. The general crux of it was that they want to eliminate the perception of quid pro quo corruption caused by the coercive influence, something that, and I believe it was McCutcheon said, that the coercive influence and ingratiation to donors is not quid pro quo corruption. There was language analogous to wanting to level the playing field and equalizing the ability for other people to participate in politics. And why is any of that relevant? I mean, because I think in answer to Judge Nelson's earlier question, I think you said that when the voters voted to approve this measure, we don't even know that they were particularly focused on contribution limits as opposed to other things that the measure was doing. So why do we think that they were motivated by the passages you just read or the PowerPoint or anything else? I think that underscores why Shrink Missouri treated it somewhat as an aside, where let's just say that it was popular and let's say that the voter, just because it's popular doesn't mean it's a sufficient basis to infringe on First Amendment rights, if it so does. Well, no, that's right. I guess I was, insofar as you were trying to suggest that this was motivated, and I think the panel thought that this was motivated by some sort of invidious discriminatory motive, even if the PowerPoint or other things support that, I don't see how we can infer that the people who voted for it were motivated by that. It's a piece of the totality of the circumstances analysis where you've got the statement of purpose that does not relate to the only legitimate purpose in a contribution limit. You have the instances of discrimination. Well, let's assume that if we read Randall as directing our attention solely to Measure B's effects, which Randall's danger signs does it light up? At the risk of conflating the Randall danger signs with its tailoring analysis, it's that there's no special justification for a limit so low, that it is lower, like I said, than most limits in other cities, and the only support for it is the district attorney's report and the fact that voters— I'm sorry, but it's not lower than most limits in most cities, is it? I mean, are you still saying that it is? If we exclude from the analysis cities that have not enacted a limit, then yes. What authority do you have that says we should exclude those? Well, I think that's common sense. If you're going to say it is in the middle of similarly sized cities, it needs to be in the middle of similarly sized cities, and that it's intellectually dishonest to exclude from your analysis half of the cities, or whatever that number might be. I don't understand what you're talking about, because the question is whether other jurisdictions have done this, not that you have to fit within some range. It's not like the bottom 25 percent are presumptively illegal. At least I haven't seen that from the Supreme Court. It's one of the danger signs. And we take all of this together, and there's nothing really that weighs in favor of its validity other than there's an omnipresent, non-illusory threat in preventing quid pro quo corruption that exists at all times. Do you have any evidence of other candidates, besides Mr. Starr, who are being unable to run effective campaigns in Oxnard in light of this Measure B? The focus was on Mr. Starr at the time. Again, there is nothing so low that has ever been upheld by the Supreme Court. Let's bring it back to how is $500 going to be a corrupting influence? We can bring it back to that, but what's the answer to my question? Do you have any evidence of other candidates, besides Mr. Starr, being unable to run an effective campaign in light of Measure B? Not on the district court record. Okay. Can I ask, on your first cause of action, it says the per-candidate contribution limits violate free speech and association. You agree that you didn't raise an equal protection claim in that first cause of action, correct? Correct. Okay. But the language that the majority opinion and you're relying on about invidious discrimination, that is all in the discussion of Buckley that deals with an equal protection claim and not a First Amendment claim. Why should we import that equal protection language into a First Amendment analysis? Because it weighs on the substantial, the government's interest in preventing quid pro quo corruption and the quantum of evidence necessary to demonstrate that. But that's not a reason to import the invidious discrimination language in Buckley for equal protection into First Amendment. I'm not hearing that reason. Well, let me ask you another question. You do not argue that Measure B is somehow facially discriminatory, right? You would agree that Measure B's language is facially neutral. The limits are unconstitutional on the face from our perspective because they are so low. We have Davis versus FEC that described Randall as recognizing that contribution limits that are too low cannot stand. So you're not basing it on invidious discrimination. Is that right? That is one of the factors that go into the totality of the circumstances that negate the government's interest in this case. The city describes this as testing the motive. So did you say it's facially neutral or not? Are you agreeing with that? It was my understanding that you did agree that it was facially neutral. It's facially neutral but still unconstitutionally low. So, okay, if it's facially neutral, do you contend that Measure B is not evenly applied? I think Judge Koh was directing to that you're somehow importing an equal protection argument into something that's facially neutral. It's evidence of the government's interest where the city has described this as improperly looking at motive which looks at the subjective intent. But when we look at the government's interest objectively, the totality of the circumstances, the focus on improper rationale to level the playing field and do things... Okay, I guess, so what's your best authority allowing us to consider the intent behind a measure that is facially neutral and evenly applied? Is it common sense? Is that your best authority? The authority is that it's not being used to evaluate the subjective intent and that it is evidence of the objective interest that the measure seeks to serve. It's part of the totality of the circumstances analysis where we add all of this together. Well, you're kind of losing me with subjective and objective and facial. I guess we're talking past each other. So where are you – where's your authority for these intents that you're arguing? The authority is – everything goes back to Randall and McCutcheon. And the quantum of evidence necessary to substantiate the government's interest varies up and down depending on the plausibility of that interest. And if all of the evidence points to this invidious discriminatory purpose plus the other considerations I've talked about, that reduces the plausibility that the city is actually interested in preventing quid pro quo corruption, which increases the amount of evidence they need to substantiate their interest. And the amount of evidence that they have provided in this case does not rise to the level necessary to substantiate that interest. Okay. Hypothetically, hypothetically, so if we were – and I don't know how people think. But hypothetically, if we were to disagree that the evidence of the voters' invidious discrimination, if we said it's not there, do you lose? No, because when we get to the second prong and the tailoring analysis, the $500 limit is not closely drawn to that interest if that interest exists. Because it is so low, because it reduces the ability of candidates to raise money and wage a competitive campaign. Okay. Counsel, is there anything in the record that shows how much a race for a council position costs in Oxnard? There's some reports in there. I mean, what are we talking about, that it's so low that it effectively keeps someone from successfully running for city council? Didn't your client, Mr. Starr, actually successfully run for city council after the limits were enacted? He had to self-fund his campaign and focus his effort on walking door-to-door rather than raising money. So it might have altered some of what he would ordinarily do to run an effective campaign, but it was effective nonetheless? But it makes it harder for people who are not in a position to self-fund. And a lot of this happened after the fact, after the district court decision. But none of them are challenging it. There's been a lot that's happened since the district court opinion. Are you challenging it on behalf of others? I guess I'm sort of tying you in. Moving Oxnard forward has a sort of membership standing on behalf of its members and others similarly situated, so yes. But back to Judge Wardlaw's question, we're talking about like $8,000, right, or $10,000? That was my recollection of what it costs to run this. That's quite low. What media market is Oxnard in? I'm sorry, I didn't hear the question. What media market is Oxnard in? Los Angeles. Los Angeles County? Yeah. There's not a separate media market for Ventura? I don't believe so. I would imagine. Okay, never mind. In any event, I've got five minutes left. I'd like to reserve the balance of my time for rebuttal. All right, thank you. Thank you. Good afternoon. Holly Whatley on behalf of the city clerk for the city of Oxnard. May it please the court. The trial court got it right. First, it properly applied the standard articulated in Edelman and Lair to conclude the city met its threshold burden to establish its interest in preventing quid pro quo corruption. How did you establish that burden? What evidence did you present to establish that? The evidence included the 2012 district attorney report of the corruption investigation involving the mayor, a city council member. Did any of that have to do with what we would call quid pro quo corruption? Yes, it did. It involved exchange of gifts for political favors. But it was a long time ago from when Measure B was happening. So I have to say that it probably, well, it does have, it's got some relevance. It wasn't the strongest case of corruption from, I mean, how long ago, if you go back to corruption in 1850 and you put that on the, is that good enough? Does it matter? It is contextual. I can give you examples where there were larger gaps than the seven years from the DA report to the adoption of Measure B. But even setting aside, I mean, your point is any quid pro quo, whether it's a contribution or just a gift, fits within that standard. That is evidence. You don't have to look at someone, you know, making high contributions in order to influence them. That is correct. Because if we look at Citizens United, which talked about the quid pro quo corruption, and they defined it as activity that would, if proven, prove bribery. And bribery is an exchange of value for political favors. I wanted to ask you about Citizens United. To what degree does that undermine our prior case law like Randall and sort of your arguments? I mean, it does suggest that the Supreme Court might be going in a different direction here or staking out something new. I mean, does that counsel us to be a little more cautious in what sort of limits we are approving? It counsels it only as to the interest at issue, and it limits it to quid pro quo corruption or its appearance. Citizens United was silent as to the quantum of interest involved. So was McCutcheon. McCutcheon found that the limits foundered on tailoring, not on the quantum of evidence. So the change that those two brought was not as to the threshold quantum of evidence. It was as to what the evidence related to, and that is limited to quid pro quo corruption. In Thompson, the Supreme Court found that the $500 contribution limit had some of the Randall danger signs because it was substantially lower than limits previously upheld. Does that mean that we should find the $500 limit here to be invalid? No. Why not? No. The $500 in Thompson was a statewide limit. Here we have examples where here we're talking about district elections and then a few citywide offices for the city of Oxnard, which has a population of about 200,000. So it makes a difference what type of election it is. If this were a bigger election that had maybe a primary for Senate or something like that, that makes a difference. It absolutely makes a difference because if we step back and remember, the interest overall that we're looking to protect is the interest of challengers and others to mount effective campaigns. And that amount is going to vary depending on the size of the jurisdiction where the campaign is taking place. What does the campaign cost here? I had this idea of $10,000 in my mind. Maybe he says that's low, and it is in the L.A. market, media market. So, I mean— I cannot answer the question of what a campaign does cost. I can point you to— Aren't there disclosure statements? There are disclosure statements, and I can point you to Table 3 in Dr. Cowser's report at ER 428, which has the chart of the total amount raised by candidates in the 2018 election, which was the last regular election held before Measure B took effect. Can we go back to Thompson? There wasn't any language in Thompson limiting it, the Randall danger sign, you know, tentative holding to statewide elections, is there? I don't know for sure. I can't say. But I do think that it does make a difference if we're looking at what Buckley talked about and Shrink Missouri, where we're looking at—or actually, Randall. Randall's focus was here are the tests to examine whether the limits are so low that they prevent challengers and candidates from mounting effective campaigns. So, against that backdrop of that purpose, it does make sense to look and adjust those limits, depending on the jurisdiction involved. There are examples of the district court decision in Thalheimer found that the $500 limit for the city of San Diego was adequate, and San Diego is far bigger than the city of Oxnard. Can you explain to me—and I've read a lot about this— but the difference between expenditures and contributions and why that's important in terms of making that. I thought we agreed we were in contribution land here, but your friend on the other side said, well, maybe not. So explain to me that in terms of why that makes a difference and where you see we are and why it may offer an opportunity to conflate analyzing something from a straight First Amendment prism as opposed to whether it's content neutral, whether it's looking at the content and what the standard of review is. Can you explain expenditures and contributions to me in that context? I can. Measure B is squarely a contribution limit. It does not apply to—it's not an expenditure limit. So committees or organizations that spend money, that expend money, not coordinated with a candidate, that expend money to advance ideas, not coordinated with a candidate under Citizens United, we know that that is entitled to a heightened— that is classic First Amendment activity to a heightened strict scrutiny review. Campaign contributions, on the other hand, are not. These are contributions made by a person to a candidate, but Buckley found that they were entitled to a lower standard of review, the closely drawn— Well, it's sort of like how would you contribute to someone that you didn't agree with. It sort of seems like you are—if money is speech, it seems like you're speaking. There is some measure of speech, but there are other ways you can associate and identify with a candidate that Buckley recognized and that are captured in the Randall factors. One of them is volunteering. You can still volunteer and associate yourself and support a candidate. What the corruption issue presents that is different between contributions and expenditures is that the opportunity for quid pro quo corruption is right there in giving money directly to a candidate, not in giving it to an organization that spends money to support the candidate's ideas. But if you had the kind of threshold burden that you would have in intermediate scrutiny, say, for example, to show that there is a real problem and that you're trying to address it and that this would actually respond to that, did you present enough evidence by presenting 10-year-old evidence of people receiving unreported gifts that that really shows that there's an interest in quid pro quo corruption fighting at the time that this was proposed? Yes, and that is because although there's some question about whether the 7-year gap is too old, there are many examples where an even greater gap existed where the interest was nevertheless upheld. Do you think it's constitutionally irrelevant if the city council supposed that it was just flagrantly conceded that the city council put this on the ballot because they wanted to kneecap Aaron Starr? Is that constitutionally irrelevant, or would you set that aside? Because there isn't a Randall danger sign. That's not on the list. In a facial challenge, motive is irrelevant, and it would be irrelevant. Why is motive irrelevant in the context of a regulation of speech? What case says motive is relevant to regulation of speech? Well, the United States v. O'Brien case. O'Brien is about conduct. In the context of conduct, that's true. But if you're regulating speech, for example, in time, place, and manner intermediate scrutiny, motive is not irrelevant. I continue to believe that on a facial challenge to a facially neutral law, that motive, when there is no equal protection... But what about the objective risk? I mean, this record creates an objective risk that this was proposed by the city council because this guy was a pain in the neck and they wanted to stop him. There is objective suspicion of that. And everything seems very well tailored with that objective and not so well tailored to a 10-year-old gift report where there were no prosecutions and no actual evidence of quid pro quo corruption. Well, when we look at the tailoring argument, the test must be based on objective risks to challengers, not on a subjective motive as to one candidate. And as to the evidence concerns you've raised... It is hard to swallow the argument that you're putting forward. I mean, that might be the legal test, but you're basically taking the position that if you have one potentially successful... It's fine to have a bunch of challengers who will never get a serious candidacy going, but if you have one serious challenger and you don't want them in there, you can target them. It doesn't seem consistent with the democratic process. I think you're... I want to step back and make some points about the evidence that we're talking about that is raising some concerns. So the council placed Measure B on the ballot on October 15, 2019. The PowerPoint presentation that's mentioned was not presented until three and a half months later, and even then it was not presented to council, and even then it was something prepared by the city manager. Do you want us to believe that this was not targeting Mr. Starr? I do. The evidence does not support that it targeted Mr. Starr. The court sustained the objections regarding the alleged motivation, and that's in the record at ER 28-30. Even if we thought it targeted Mr. Starr, it doesn't matter. Correct, for a facial challenge. What is absent here, and where maybe motive becomes an issue, is if there is an equal protection challenge based on a discrimination against challengers as a class. Even Shrink Missouri states that if a campaign limit particularly limits only one candidate, even that, even on those facts, that is not enough to find it unconstitutional. Does it matter that the people voted on Measure B, and is that where you would have to find the invidious discrimination? Does it matter that that fact happened? It is relevant, and that is because the voters approved it, so we've got to look at the voters' motive. One would have to look at that. Why was it submitted to the voters? Because the city council could have enacted this directly. Why was it submitted to the voters? Their statement was to put it to the voters so the voters could decide. It was to put it to the voters. Was there a component of this package that had to go to the voters? Because you had gifts, you had term limits, and then you had the contribution limits. Was there one component that required a ballot initiative? I can't recall for sure. It may be that the term limits did require one, but I can't know for sure. Okay, so it had to go to the voters for the term limits, and these were piggybacked on. I'm not sure about the term limits. A moment ago you said that an equal protection claim here would have to be based on discrimination against challengers as a class. Did I understand that correctly?  So why couldn't you have a claim? I mean, the village of Willowbrook says you can have equal protection claims based on discrimination against a class of one. So in a case where the council said, we have no problem with challengers in general, we just don't like this person, you don't think you could have an equal protection claim based on that? Well, importantly, one was not pled or alleged here. It was not the subject of the motion. Fair enough, but just as a matter of equal protection law, would that be a viable claim? Or could it be? Theoretically, I am aware of the law that says there can be a class of one. Here, equal protection was not alleged as a basis. I don't see why that matters, because if the First Amendment protects against targeting speakers and content and that overlaps with equal protection, why does it matter whether equal protection wasn't alleged? If First Amendment was alleged and the First Amendment has a concern about targeting speakers and targeting content, then an objective risk of that, then why isn't there an inquiry into that? I don't understand why that's not on the table. Well, I think that Buckley, when it talked about invidious discrimination, it was in the context of the First Amendment challenge there, and it said there was no grounds for it there. Are you saying that cities can adopt contribution limits for the purpose of targeting specific candidates or under circumstances that create an objective risk that they may be, in fact, trying to target particular candidates? Are you saying the First Amendment doesn't care about that? When there is not a claim of equal protection... I take the answer as yes, then. Was there a viewpoint discrimination claim pled here? No. Was there a retaliation claim made? No. Counsel, let me ask you this. Outside of the equal protection context, I think it's always pretty heavily disfavored to start looking at different legislator intent because one legislator may think X and another one may think Y, but even assuming that that legislative intent or motive is somehow considered, how does that weigh into the fact that it overwhelmingly passed? Where does the voter intent versus legislative intent, how does that interplay work? Well, in the Lehr case, one of the arguments was made that in the voter pamphlet there was language in it that suggested there was an impermissible motive for the limit at issue there, and this circuit counseled that we're not going to look at motive. What we're going to do is we're going to look at tailoring. This is not a motive inquiry. This is a tailoring inquiry. So you look at the tailoring factors, the later factors in Randall, to evaluate whether the limit creates the alleged problems. And here the trial court didn't reach the later Randall tailoring factors because it determined there was an absence of any danger signs in the first instance. But when you look at this court can nevertheless still affirm because it has a record before it and can determine that here those factors don't counsel against finding the limit. Do Lehr and Edelman need to go? And if they go, does that make any difference to the outcome for you? They do not need to go. They are consistent with Supreme Court authority, even that that postdated it. They remain a good law and a statement as to what the quantum of evidence is. And do you think a claim for the overruling of Lehr and Edelman has been properly presented here? Well, it wasn't raised in the lower court, in the trial court, and it wasn't addressed at the court of appeal at the initial three-judge panel stage. So it's forfeited? I would argue it is forfeited. Well, but it was binding precedent at both the district court and the three-judge panel level, correct? It was. Right. So you have to ask in a footnote in your merits brief for overruling en banc. Do we ask for briefs to be cluttered that way before people can raise issues before the en banc court? Well, I do think there needs to be some fair notice of the claims made by one side so the other can prepare to meet them. Certainly, we took the request for supplemental briefing as the opportunity to prepare to meet that issue, but that was not first raised at the trial court or at the lower court. I mean, I'm sorry, at the panel decision stage. But do you agree that you would lose under the standard that Judge Okuda advocated in her dissent from denial of a hearing in Laird, that it should be the same threshold test as it for intermediate scrutiny, or do you think you would win under that test? I think we would win, and that is because of the evidence that we provided of, as a reminder, we're talking about gifts that were made to elected officials who then participated in decisions to, for example, recommend a multimillion-dollar contract for one of the jet owners. So the private jet trips to Cabo and to Napa, companies associated with that business owner got favorable deals with the city. The same private jet flew a different council member to Cabo, and the day after the return voted on selling valuable property to that person. So these are actual, genuine exchanges, evidence of exchanges of money for political favors. And as to the critique as to the time gap, I want to address that the dissent in Edelman and the dissent in Laird critiqued the evidence there and recall that among the evidence there was the 1981 burn this letter after receipt or something like that and the 1982 voter survey or public survey. The limits that were adopted there were adopted in 94, and the dissent in critiquing that evidence nowhere, nowhere talks about the time gap. We also have the Second Circuit decision in Onyebene where there was a gap of 19 years from the original contribution to the ultimately upheld limits there. So the gap, the critique that came in Edelman and Laird was that the evidence there, regardless of the timing, showed influence, not quid pro quo corruption. And when in Laird the dissent made that critique, it asked, where is the evidence that a legislature caused the rerouting of a freeway to benefit a commercial owner who paid the legislator's vacation travels? We have that evidence. It would meet even intermediate scrutiny. So I take it, given your argument about subjective intent evidence, that you don't consider this to be, you're not presenting this as like, the voters must have been thinking about this when they voted for the council. People must have been thinking about this, right? This is, in your view, some sort of objective evidence that would support these. It's old, but it's objective evidence. It has to be. Or are you thinking this is subjective? No, it is objective evidence that supports the interest. Right, so I hope you can see where I'm going with this. It just seems like the game board has been set up a little bit unfairly because when it comes to evidence of the possibility of corruption, everything counts. And it's real things that happen, and it doesn't have to know that anybody's actually acted on that. In fact, we know that the person that had power to do it, the DA, didn't, right? But on the other hand, if you look at anything other than that, which would be trying to go after one person, that gets characterized as impermissible subjective evidence. And so it just seems like it's very difficult for anybody to ever meet their burdens in these cases because the objective evidence is the quid pro corruption. Any evidence of that is always going to be available because we live in a fallen world where somebody's going to do something bad. At some point, if it's not seven years, 14 is probably close enough, 21. I don't know about 1850, but somewhere in between there. But on the other hand, everything else is always going to be, well, that's subjective evidence. Like how could you ever win under the standard that the way you're articulating and I think maybe the way our courts, how could a person ever win? That's what I'm struggling with. You see the challenge I'm having is it seems like the whole thing is set up to make it always comes in, the appearance of quid, it's almost always the appearance of quid. But everything else does not come in because that's motive evidence. Well, in this case, even if we look at the motive evidence, at least as to when the counsel placed it. You say motive evidence. Even if we look at the evidence that there was a person who was running that. So ignore what anybody thought about it, but we could look and say objectively this person might be affected worse off by this. Is that what you mean by motive or what do you mean? Well, I'm talking about the motive allegations. The evidence is the PowerPoint, which again, the objective evidence, is that the counsel voted to place it on the ballot. Three and a half months before that PowerPoint ever appeared. But the quid pro quo wouldn't be objective evidence under that. So how do we, why does quid pro quo come in, but possible concerns about trying to keep a particular person out does not come in? You see the challenge there? Well, we're talking about two separate steps. Well, that's the thing. It's two separate steps because we've set it up that way. I mean, because we've set it up that way. And especially when you take the Edelman layer gloss on it. And so when I try to zoom out and look at this from further away, the first step when you say is there any chance of quid pro quo, I mean, as they said in their supplemental brief, it's always going to be met. So that step, that's always going to be met. And then what we call narrow tailoring, we basically have a paragraph and we say, you know, it's like Second Amendment cases. We quote the language from the Supreme Court and then we explain for the rest of the opinion about how it's not narrow at all and it's really deferential from us and all that. And so it just doesn't feel like it's standard that anybody could ever win. I mean, what would count as winning? What would let somebody like them win a case like this? Well, I don't think they could win this case. No, what could be? I think if we had signed affidavits from everybody that voted for it that they voted for it to go after one individual person, it doesn't sound like that would win because it's subjective and that's fine. So what could somebody, and the dollar amounts from the Supreme Court cases are enough because this is a city, even though it's a city that's a lot closer to the size of, I mean it's a county, it's a lot closer to the size of Montana than it is to the size of California, right? So I'm just trying to figure out like how anybody could ever win on one of these cases. Well, they can't win on this case. That much I know on this record and on this case. But give us some facts where someone would win. Let's say you didn't put that paragraph in. You put nothing in about a past problem. Would they win? If they had pled a, you know, that since this was a facial challenge, if they had pled an equal protection claim based on disparate impact and they had evidence to show that it affected challengers as a class, Buckley suggests that could be an issue. And none of that was present here. So it sounds like your argument is, I mean this is really important because some of your argument is, well, they just pled this wrong. But it doesn't seem crazy to me to think that if when you're talking about a speech case, if you're trying to, you know, you could plead it as a equal protection class of one type case, but couldn't you also plead it as a targeting type case? It seems to me like why couldn't you target it? Why couldn't you plead it that way? Well, again, this was not pled as a First Amendment retaliation or a First Amendment targeting claim. This was a straight up on its face. Hold on. It was a First Amendment targeting claim, wasn't it? I mean he claims that you adopted these rules to target him and put him at a disadvantage. I mean he doesn't bring an equal protection clause claim, but he does bring it as a First Amendment targeting claim, seems to me. He moved for summary judgment on his spatial claim and didn't pursue the as applied. So if I look at the complaint, let me look at the First Amendment complaint. I actually don't see anything. I'm looking at ER 521 through ER 524, which is the first cause of action, which is the only one that's at issue here. I don't actually see anything here about retaliation against Mr. Starr. Correct. If you look, I mean I'll just go through it. It says, you know, it's challenging whether they're closely drawn because it would take significantly more than a $500 and $750 contribution to create even the appearance of quid pro quo corruption, let alone its reality. They're insufficient to allow candidates to amass sufficient resources to wage an effective campaign. Treating candidate campaign committees differently from other committees controlled by a candidate further restricts individual rights of speech and association. I don't actually see any allegations in this first cause of action that have anything to do specifically with Mr. Starr. He's not mentioned here at all. I don't see his name. I don't see any of this retaliation in here. Correct. At the summary judgment there was such evidence, and indeed you indicated the district court declined to consider any evidence of targeting, correct? That's correct. The district court sustained our objections to that evidence, and the plaintiff did not appeal that evidentiary ruling. I guess a lot of questions being presented to you, but I guess let me ask you this. The burden to overturn these democratically passed laws, shouldn't they be relatively high? They should be, and that does relate to the fact that to the extent that the rationale for overturning it is based on a motive concern. As Justice Scalia said in Lukumi, it's impossible to determine the motive of a collective legislative body. It's even more attenuated and impossible when that legislation was approved by voters. Thank you. In my few minutes left. Oh, you're over time. Oh, I'm sorry. Thank you. Thank you so much. Irrespective of the sufficient analysis to determine the sufficiency of funds for challengers to mount an effective campaign, before we get there, there needs to be a nexus between the contribution limit and the corrupting influence on that limit. And $500, there's no evidence in the record, there's no even real logic that says $500 is going to be corrupting. Do you agree that the DA report shows evidence of quid pro quo corruption? No, especially to the extent that it focuses on gifts as opposed to campaign contributions. But where this goes is- Does that matter? I'm just wondering, under Randall, does that matter? I mean, if it's quid pro- it has to be quid pro quo, but does Randall also say that it has to be contributions as opposed to gifts? I mean, it seems like both could be used. It doesn't matter because there's no First Amendment right to receive a gift. But there is a First Amendment right to campaign for public office. And that gets to another issue that was briefed before, and it was mentioned in the lower court, the prior appellate briefing here, and that's the candidate's right under the First Amendment to raise money for their campaigns as distinct from the donor's right to give to the campaign. And as this- and that's where it becomes an expenditure limit because as the limit shrinks and approaches zero, there might very well be voter support to end political speech altogether and let's- political contributions are illegal. We don't want anybody making contributions, and that would be a patent First Amendment violation. But as our limits approach zero, that's more or less where we're going, and it limits the amount of speech the candidate can engage in and puts it into outside entities, taking it away from the candidates to speak on their own behalf and having super PACs and different kinds of third parties who are speaking for them without their coordination or maybe with it, we don't know. And that is a much bigger problem here, and that's the biggest issue as these limits approach zero and why the court needs to look very carefully at the $500 limit and whether there is any interest in limits so low as those eventually kind of transpose on top of the Randall analysis where the most important consideration here is that the limits are just really low, unreasonably, unrealistically, unconstitutionally low. I don't know what the upper limit means. So what do you make of the expert opinion in Table 3 that shows that of cities between similar populations, these limits fall right in the middle? As I said before, I think his analysis is intellectually dishonest. Because? Because he excluded the cities that have no limits at all. Is there, I guess some people have asked this, but where would that requirement come from, that the comparison would be? Because it seems like the case law talks about the comparators are other places with low limits. The basis for comparison is other jurisdictions. But counsel, under the standard, not every government, local, state, federal entity can pass contribution limits because they have to have more than a hypothetical interest in passing one. So by definition, there will be only some with contribution limits. So why would the correct comparator be ones who have none? And that relates also to the government interest. If they don't have an interest in implementing contribution limits, then the problem might not be as pervasive as some perceive it to be. As I'm out of time, final thought here is on the ultimate issue here is the summary judgment motions. The city's summary judgment motion is unsupported. During the argument, it was mentioned that plaintiffs move for summary judgment on this one issue, and that one issue is the $500 limit. If the court were to not find that that $500 limit is potentially, there's no basis there to force the district court to grant our summary judgment motion, and the record is incomplete on some of the other issues, the appropriate solution there would be to remand to build the other claims that have been described as not sufficiently pled and supported. But on the record we have here, $500 is too low, period. Thank you. The case of moving Oxford versus Lourdes Lopez is now submitted. Mr. Morgan, Ms. Whatley, thank you very much for your oral argument presentation. We are adjourned.
judges: MURGUIA, WARDLAW, CALLAHAN, NGUYEN, OWENS, NELSON, MILLER, COLLINS, VANDYKE, KOH, SUNG